**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KENNETH MCERLAIN,** | : | |
| *Plaintiff,* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **SPS TECHNOLOGIES,** | : | **No. 17-3034** |
| *Defendant.* | : | |

## <u>M E M O R A N D U M</u>

PRATTER, J.                                                     JANUARY 28, 2019

        SPS Technologies fired Kenneth McErlain in March 2016 after Mr. McErlain had an altercation with two supervisors. During that incident, one supervisor, James Little, chastised Mr. McErlain for failing to wear safety glasses while clocking-in to work. Mr. McErlain alleges that Mr. Little's actions (and Mr. McErlain's subsequent termination) were (1) retaliation for a complaint Mr. McErlain filed with the Pennsylvania Human Rights Commission alleging age discrimination by SPS, and (2) part of a broader campaign of discriminatory conduct aimed at Mr. McErlain. According to Mr. McErlain, Mr. Little disparately enforced performance requirements, referred to Mr. McErlain as "Kenny" to goad him, and enforced SPS's written safety glasses policy arbitrarily (and contrary to SPS's unwritten practices).

        Based on the record before the Court, there is minimally sufficient evidence for Mr. McErlain's age discrimination claims to survive summary judgment. Because Mr. McErlain cannot establish a *prima facie* case of retaliation, however, the retaliation claims must be dismissed.

SPS Technologies manufactures and produces high-strength fasteners for various applications and severe environments. The company maintains and distributes a policy against discrimination, including age discrimination, and SPS also conducts anti-discrimination trainings. SPS allows employees to report discrimination and other work-related complaints via a phone hotline, which is operated by third-party vendor EthicsPoint.

Kenneth McErlain worked for 37 years at SPS. Mr. McErlain turned 60 on November 19, 2013. According to Mr. McErlain, as he approached age 60, SPS increasingly took issue with Mr. McErlain's performance.

Mr. McErlain's time working at SPS can be divided into two buckets: (1) the period before 2011—when Mr. McErlain worked mostly without incident; and (2) the period after 2011, when Mr. McErlain began receiving reprimands for his outputs and for insubordination.

### 1. Pre-2011

Mr. McErlain began working at SPS as a machine operator on February 19, 1979, and he worked in various departments over the course of his career. In or around 2006, he began working in the nut machining department as a machine operator on the second shift. The record only includes the following warnings or notices regarding Mr. McErlain's performance prior to 2011:

> ➢ December 11, 1980—Written Warning, explaining that it was Mr. McErlain's second warning about his production, which "must improve";
>
> ➢ March 20, 1995—Supplemental Conduct Report, indicating that Mr. McErlain achieved 49% productivity, which was below target; and
>
> ➢ December 19, 2002—Annual Review, showing that Mr. McErlain achieved 56% productivity against a productivity target of 75%. His overall rating for the period was "competent," and the only "weakness[]" identified for "improvement" was that Mr. McErlain had a habit of taking too many breaks.

## 2. 2011 – Present

Though Mr. McErlain's performance was occasionally problematic in his younger years, it became a near constant issue as he grew older. Mr. McErlain received repeated write-ups for poor productivity as he neared (and passed) his 60th birthday, on November 19, 2013. And as Mr. McErlain's performance came under additional scrutiny, he increasingly found himself at loggerheads with shift supervisor James Little. Mr. Little, in addition to writing several of the aforementioned reprimands, also referred to Mr. McErlain by the moniker "Kenny," which, according to the more senior, i.e., older, Mr. McErlain, caused him to feel "belittle[d], demean[ed], scold[ed] and diminish[ed]."

In the post-2011 period, Mr. McErlain received the following writeups or disciplinary actions:

> ➤ October 11, 2011—Performance Improvement Recap, stating that Mr. McErlain's production performance was "unsatisfactory." He was on pace for 105.7% productivity during the applicable period against a target of 110%; if he failed to improve to the level of 110% over the following four weeks, "other corrective actions" could follow. This report was signed by Tim Walsh.

> ➤ January 27, 2012—Performance Improvement Recap, stating that Mr. McErlain's production performance was "unsatisfactory." He was on pace for 74.9% productivity during the applicable period against a target of 110%; if he failed to improve to the level of 110% over the following four weeks, "other corrective actions" could follow. This report was signed by Tim Walsh.

> ➤ October 15, 2013—Letter to Mr. McErlain, stating that his production performance was "below expectations. He was on pace for 77% productivity during the applicable period against a target of 100%. The signature on this letter is illegible.

> ➤ October 24, 2013—Coaching Letter to Mr. McErlain. Although this letter is not itself included in the record, there are several references to the coaching letter in other documents.

> ➤ November 7, 2013—Performance Improvement Plan, stating that Mr. McErlain had a productivity "performance deficiency" and setting a plan for improvement. He was on pace for 82% productivity during the applicable period, compared to

an "area average/expectation" of 86%. The Plan set a goal of 90% productivity for Mr. McErlain during the upcoming period (i.e., until November 26, 2013). This report was signed by Mr. Little.

➢ December 11, 2013—Employee Supplemental Conduct Report, stating that Mr. McErlain's production performance had "not reached the expected level set." The report states that it "[w]ill [b]e the [f]inal [w]arning [p]rior to [t]ermination." This report was signed by Mr. Little.

➢ January 13, 2014— Employee Supplemental Conduct Report and Last Chance Final Warning, stating that Mr. McErlain had the following issues: (1) "poor work performance" in the form of production, and (2) "[r]efusing to obey the orders of supervisors or their designated representatives." Specifically, Mr. McErlain was involved in a January 8, 2014 incident that resulted in his suspension for the remainder of that day's shift. The Final Warning indicated that SPS conducted an investigation and found that Mr. McErlain violated the company's Guidelines of Conduct. This report was signed by Mr. Little.

➢ March 6, 2014—Suspension, for Mr. McErlain's poor performance of duties as an operator.

➢ March 24, 2014—Conditional Improvement Plan, which included a commitment by Mr. McErlain to improve his (1) "poor work performance," (2) attendance, and (3) professionalism and following instructions. Mr. McErlain signed the Plan as a condition for reinstatement from suspension. The report notes that failure to adhere to its conditions would result in termination. This report was signed by Mr. Little.

➢ March 26, 2014, Hourly Employee Appraisal, stating that Mr. McErlain's production performance was "below standard for quality and quantity of work." He was on pace for 93% productivity during the applicable period against a target of 110%. The report also noted that Mr. McErlain had issues with arriving late for his shift. This report was signed by Mr. Little.

➢ March 20, 2015, Hourly Employee Appraisal, stating that Mr. McErlain's performance was "below standard for quality and quantity of work." He was on pace for 74% productivity during the applicable period against a target of 110%. This report was signed by Mr. Little.[1]

---

[1] According to Mr. McErlain, the record does not reflect any complaints about the quality of his work (only the quantity of his outputs). He is correct that every Hourly Employee Appraisal included in the record states that Mr. McErlain's outputs had "0 defects." Those same Hourly Employee Appraisals, however, score productivity and quality together in one category, without any distinction made between the two. In other words, a low production score could offset or drag down a high or median quality score, assuming the numbers are averaged or combined. Indeed, Mr. McErlain's March 20, 2015 Hourly Employee Appraisal acknowledged

In several instances, Mr. McErlain refused to sign or acknowledge receipt of the reports taking issue with his production.

According to Mr. McErlain, his work performance, and in particular his production outputs, was subject to more scrutiny after 2011. But any stricter productivity standards imposed by SPS also appear to have applied to all employees in Mr. McErlain's department, and Mr. McErlain was not the only employee near the age of sixty in his department. The record contains one report showing that two other machine operators, Hector Martinez and Jim McLaughlin— who worked on the same machines as Mr. McErlain and are approximately the same age as Mr. McErlain—both surpassed their production targets and are still employed by SPS. At the time Mr. McErlain was fired, Mr. Martinez was about 57 and Mr. McLaughlin was about 55.

### A. Mr. McErlain's First Age Discrimination Complaint

In or around May 2014 (after Mr. McErlain's suspension and the bulk of his productivity issues), Mr. McErlain filed a charge of discrimination with the Pennsylvania Human Rights Commission (the "first PHRC complaint"). In his first PHRC complaint, Mr. McErlain alleged that he was suspended because of age discrimination and that his increased productivity goals were intended to push an older worker out of the company.[2] Mr. Little and the SPS Human Resources Director, Tamika Still, each testified that they were not aware that Mr. McErlain filed the first PHRC complaint.[3]

---

that he was "always cognizant [sic] that he is running dimensionally conforming parts," but that Mr. McErlain placed such a "heavy focus" on quality that it slowed down his output.

[2]   The PHRC investigated the matter and dismissed Mr. McErlain's complaint on September 18, 2015, because the facts provided did not establish that probable cause existed to demonstrate unlawful discrimination. The EEOC adopted the PHRC's findings and provided Mr. McErlain with a Notice of Suit Rights on January 13, 2016.

[3]   Ms. Still testified in her deposition that she "did not know" that Mr. McErlain complained to the PHRC and did not know that a complaint had been filed, but she did know that

## B. Subsequent Incidents

After Mr. McErlain filed the first 2014 PHRC complaint, he was involved in two additional incidents prior to his termination.

### i. The Toolbox Incident

In late 2015, Mr. McErlain discovered a bent rod in his toolbox, which he believed was the result of a co-worker trying to break into the toolbox. In response, Mr. McErlain taped the rod to the toolbox along with a note reading "nice bend on this rod maybe it would work on your neck." On December 23, 2015, Mr. Little and Dave Wuest spoke with Mr. McErlain about the threatening note. Five days later, Mr. McErlain called the EthicsPoint complaint hotline, alleging he had been harassed by Mr. Little and Mr. Wuest for more than a year and that they had confronted Mr. McErlain about the note he had left on his toolbox. SPS Human Resources Director Still spoke with Mr. McErlain about the issue and explained that she had investigated and (1) she was not able to conclude who, if anyone, tampered with his belongings and (2) that there was no evidence of harassment.

### ii. The Safety Glasses Incident

Mr. McErlain's final incident at SPS occurred on March 11, 2016, after Mr. Little noticed Mr. McErlain walking through the plant without his safety glasses on. According to Mr. Little, SPS had recently conducted a safety audit and there was "no budging" on SPS's safety glasses policy, which requires that employees wear safety glasses "[i]n all manufacturing areas and

---

SPS received a letter stating that Mr. McErlain's complaint "had been dismissed" because she "was there at the time the letter was received." MSJ, Ex. F (Still Depo. Tr. 89:9–90:10). Ms. Still was aware that Mr. McErlain had complained to the company that he was experiencing "harassment." MSJ, Ex. F (Still Depo. Tr. 105:9–14) ("Q. You were aware that [Mr. McErlain] was claiming age discrimination and harassment? A. Oh, no. I'm sorry. Not age discrimination, but he called out harassment in the call [to the EthicsPoint complaint hotline]. So that's what I was aware of based on the call.").

adjacent aisles of the plant." Mr. McErlain submits that although failing to wear safety glasses was a technical violation of SPS's safety policy, it was standard practice for employees to put on safety glasses only *after* clocking-in at the company time clock, an informal policy to which he had adhered for decades.

Mr. Little confronted Mr. McErlain about the violation and instructed Mr. McErlain to put on his safety glasses, which Mr. McErlain describes as an attempt to "berate" and "embarrass" him, "scold[ing] [Mr. McErlain] as if he were a child." Further, Mr. Little again referred to Mr. McErlain as "Kenny," a nickname Mr. McErlain felt was disrespectful. Mr. McErlain responded by yelling at Mr. Little and stating that Mr. Little did not respect him, at which point Scott Allem, another shift supervisor, approached Mr. McErlain and Mr. Little and tried to ease the situation. Mr. McErlain told Mr. Allem to "shut up" and left the floor to go to his work station, putting on his glasses as he walked away. Multiple other SPS employees who were in the area agreed that Mr. McErlain raised his voice at and was generally disrespectful to Messrs. Little and Allem.

### C. Final Suspension, Investigation, and Termination of Mr. McErlain

The same day as the safety glasses incident, Mr. Little, Mr. Allem, and Mr. Wuest reported the incident to the SPS Human Resources Department. Human Resources Generalist Meghan Keenan escalated the situation to the Senior Vice President of Human Resources, Dan Dohar, who recommended suspending Mr. McErlain until an investigation could be completed. Ms. Keenan also spoke with Mr. McErlain, who told her that "nothing happened" and did not describe his impression of his interaction with Mr. Little.

Mr. McErlain received a letter suspending his employment with the instruction to contact Ms. Keenan daily for updates on the status of his employment. Between Friday, March 11, 2016 and Monday, March 14, 2016, Ms. Keenan collected witness reports from those who observed

the incident, including taking statements from Mr. Little, Mr. Allem, and two others—Brian Peterson and Mike McGinnis. Although Mr. McErlain maintains that he was not confrontational, all of the witness accounts indicated that Mr. McErlain was loud and aggressive during the encounter and that Mr. Little was calm.

Soon thereafter, SPS Human Resources Director Still and Senior Vice President Dohar began collectively reviewing what further action, if any, SPS would take against Mr. McErlain. They reviewed witness statements, the company's employee guidelines on conduct, and Mr. McErlain's employee file, which included reports of prior insubordination, disobeying orders, and productivity concerns, before ultimately recommending Mr. McErlain should be fired.[4] Ms. Still testified that Mr. McErlain's first PHRC complaint was not a factor in her recommending termination, and that even if she had not reviewed Mr. McErlain's personnel file for previous instances of insubordination, the safety glasses incident alone would have warranted termination.

Around March 18, 2016, Mr. McErlain called the EthicsPoint complaint hotline. Aside from Mr. McErlain grieving his suspension, the content of the call is unclear. The EthicsPoint hotline notes do not reference Mr. McErlain claiming that age discrimination was a motivation for the suspension.

SPS terminated Mr. McErlain's employment on March 21, 2016; he was replaced internally (rather than by an outside hire). Mr. McErlain disputed his termination by sending a letter to the CEO of SPS's parent company, Precision Castparts Corp., and then filing a second

---

[4]     *See* MSJ, Ex. F (Still Depo. Tr. 25:8–20) ("Q. What do you recall of the discussion [about firing Mr. McErlain]? A. Reviewing the statements, taking a look at the handbook and our guidelines on conduct, which referred to insubordination, disobeying the directive of your supervisor, also discussing the personnel file and any previous sort of corrective actions and weighing all those together to come to a decision. Q. And what was the discussion around those factors? Do you recall who said what? A. I don't recall who said exactly what, but that he violated the conduct, the policy on conduct.").

complaint with the PHRC.  The letter to the CEO included no allegation that Mr. McErlain was treated unfairly because of his age, but Mr. McErlain wrote repeatedly that his work had been acceptable throughout his long history with the company.  Mr. McErlain also stated that Mr. Little's practice of calling Mr. McErlain "Kenny" was upsetting and disrespectful.  The second PHRC complaint focused almost entirely on the safety glasses incident, but concluded by stating that Mr. McErlain (1) was "the oldest person working in [his] department"; (2) was "singled out for performance-related criticism"; (3) filed a previous complaint with the PHRC; and (4) believed his termination was motivated by "retaliation . . . as well as due to [his] age."

On April 15, 2016, SPS's Senior Human Resources Director, Heidi Askew sent Mr. McErlain a letter stating:

> I am aware that you also recently protested your termination and complained about potential mistreatment due to age to PCC Corporate.  A Corporate representative looked into your concerns and could not conclude there was any evidence of mistreatment due to age or that your termination was inappropriate in light of your outburst with management and prior disciplinary history.

### LEGAL STANDARD

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party.  *Kaucher v. Cnty. of Bucks,* 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  *Id.* (citing *Anderson,* 477 U.S. at 248).  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party and draw all evidences in that party's favor.  *Id.*  However, "[u]nsupported assertions, conclusory

allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.,* 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). Where the non-moving party bears the burden of proof on a particular issue, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met its initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

## DISCUSSION

Age discrimination and retaliation claims—whether brought under the Age Discrimination in Employment Act or Pennsylvania Human Relations Act—are analyzed in multiple steps, pursuant to the Supreme Court's decision in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). The Court addresses Mr. McErlain's claims as follows: First, it discusses the burden-shifting framework under *McDonnell Douglas.* Second, the Court analyzes

whether Mr. McErlain has set forth a *prima facie* case of retaliation—he has not. <u>Third</u>, the Court analyzes whether Mr. McErlain has set forth a *prima facie* case of age discrimination—he has. <u>Fourth</u>, the Court applies remaining portions of the *McDonnell Douglas* analysis to Mr. McErlain's age discrimination claims, determining that Mr. McErlain rebutted SPS's showing of a nondiscriminatory reason for firing Mr. McErlain. <u>Fifth</u>, and finally, the Court addresses the parties' dispute as to whether Mr. McErlain mitigated his damages.

## I. *McDonnell Douglass* Standard for Age Discrimination and Retaliation Claims

"In the Third Circuit, ADEA and PHRA discrimination claims are litigated according to the burden-shifting framework developed in *McDonnell Douglas*[.]" *Cridland v. Kmart Corp.*, 929 F. Supp. 2d 377, 384 (E.D. Pa. 2013) (collecting cases). ADEA retaliation claims, like age discrimination claims, are subject to the *McDonnell Douglas* framework. *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015).

Under *McDonnell Douglas,* a plaintiff bringing employment discrimination claims, such as for age discrimination or retaliation, must first establish the *prima facie* case for each claim. 411 U.S. at 802. After a plaintiff has made its initial showing, the burden shifts to the defendant, who must articulate a legitimate, nondiscriminatory or nonretaliatory reason for the employer's adverse employment decision. *Id.*; *see also Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009); *Daniels*, 776 F.3d at 193. And after the defendant presents evidence of a nondiscriminatory or nonretaliatory basis for the defendant's decision, the burden shifts back to the plaintiff to show that "the employer's proffered justification for the adverse action is pretextual." *Smith*, 589 F.3d at 691; *see also Daniels*, 776 F.3d at 193.

## II. Mr. McErlain Cannot Make a *Prima Facie* Case of Retaliation

Mr. McErlain's retaliation claims do not satisfy the *prima facie* case, as is necessary to survive summary judgment. "To establish a prima facie case of illegal retaliation under the anti-discrimination statutes, a plaintiff must show: '(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'" *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567–68 (3d Cir. 2002) (quoting *Krouse v. American Sterilizer Co.,* 126 F.3d 494, 500 (3d Cir. 1997)).

SPS focuses its analysis on whether Mr. McErlain has satisfied the third element of the *prima facie* case of retaliation, causation, asserting that too much time elapsed between Mr. McErlain's first PHRC complaint (the at-issue protected activity)[5] and his termination to satisfy the causation requirement. See *LeBoon v. Lancaster C.C. Ass'n*, 503 F.3d 217, 233 (3d. Cir. 2007) ("[A] gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment.").

Although SPS is right that substantial time passed between Mr. McErlain filing the first PHRC complaint and his termination, the "mere passage of time is not legally conclusive proof against retaliation." *Robinson v. SEPTA*, 982 F.2d 892, 894 (3d Cir. 1993). "In the absence of such a close temporal proximity, [courts] consider the circumstances as a whole, including any *intervening* antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." *Daniels*, 776 F.3d at 196 (emphasis added); *see also Woodson v. Scott Paper 137 Co.,* 109 F.3d 913, 920 (3d Cir.1997) ("In the absence of temporal proximity,

---

[5] Mr. McErlain did not file his second PHRC complaint until after he was fired, and so his retaliation claims are unrelated to the second PHRC complaint.

causation may be established by a 'pattern of antagonism' tending to show causation between the protected act and adverse employment action.") (quoting *Robinson,* 982 F.2d at 895).

To establish that he was the victim of an ongoing pattern of retaliation, Mr. McErlain argues that after he filed the first PHRC complaint, he received negative performance scores that "falsely" included poor ratings for the quality of Mr. McErlain's outputs. Although the post-2011 reports and writeups may be evidence of *discrimination*, they cannot be evidence of retaliation, because nearly all of the reports predate Mr. McErlain's protected action. Indeed, only one of the reports in the record, from March 20, 2015, post-dates Mr. McErlain filing his first PHRC complaint in May 2014. *See supra* at 3–6 (showing that Mr. McErlain filed the first PHRC complaint in May 2014, after nearly all of his productivity reprimands). That Mr. McErlain received only one production-related disciplinary writeup in the two years after he filed his first PHRC complaint, when compared to the 10 reports he received between 2011 and 2014, undermines his argument that he was the victim of retaliation. After Mr. McErlain filed the first PHRC complaint, SPS's treatment of him—at least in the context of official reprimands—appears to have improved rather than worsened.

Mr. McErlain seemingly recognizes that he cannot rely solely on his disciplinary record to establish retaliation, as he acknowledges in his complaint that "[a]fter filing the Charge of Discrimination, [Mr. McErlain] noted that the overt acts of bias and animus [by] [sic] [Mr.] Little lessened, however [Mr. McErlain] continued to perceive that he was being singled-out and labeled as a trouble-maker by [Mr.] Little at every opportunity." Compl. ¶ 22. The complaint does not elaborate about the times Mr. McErlain was "singled out," and the record only contains two other discrete events, post-dating the first PHRC complaint, that could even potentially be construed as retaliatory: (1) Mr. Little's enforcement of the safety glasses policy on March 11,

2016, and (2) Mr. McErlain's termination shortly thereafter.[6]  Mr. McErlain does not, however, connect either of these incidents to the filing of his first PHRC complaint or otherwise offer evidence suggesting that they were motivated by a retaliatory animus.

First, as to the safety glasses incident, the only evidence that Mr. McErlain submitted that Mr. Little (who approached Mr. McErlain about not wearing safety glasses) even knew about the first PHRC complaint is Mr. McErlain's own self-serving statement of facts, which says (without record support) that he "knew that HR Director Still and [Mr.] Little knew of his 2014 PHRC filing."  Pltff. Counterstatement of Facts at ¶ 70(b); *cf.* Def. Reply to Pltff. Counterstatement of Facts at ¶ 70(b)(i) ("Plaintiff has not set forth sufficient evidence to dispute the essential elements in this paragraph.  Plaintiff has set forth no evidence to support his contention that he 'knew' [Mr.] Little knew of his 2014 Charge[.]").  Mr. McErlain's "conclusory assertion" is not evidence sufficient to create a factual dispute as to whether Mr. Little knew about the first PHRC complaint.  *See Paladino v. Newsome*, 885 F.3d 203, 205 (3d Cir. 2018) ("[C]onclusory assertions are insufficient to survive a motion for summary judgment.")  Simply put, Mr. Little could not retaliate for something he did not know occurred.[7]

Second, Mr. McErlain has not submitted evidence that would allow a jury to determine that his termination was the result of retaliation.  The record is unclear on whether the SPS human resources employees who decided to fire Mr. McErlain—Human Resources Director Still

---

[6]     There is nothing in the record establishing whether another employee broke into Mr. McErlain's toolbox, let alone that the break-in was the result of, or had anything to do with, Mr. McErlain filing his first PHRC complaint.

[7]     This is not to say that Mr. Little may not have been using the safety glasses policy as a pretext to harass Mr. McErlain.  Although the record contains no evidence that Mr. Little knew about Mr. McErlain's first PHRC complaint (and therefore Mr. Little could not have been *retaliating*), there is sufficient evidence to at least create a material issue of fact as to whether Mr. Little was targeting Mr. McErlain based on his age (and therefore Mr. little could have been *discriminating*).  *See infra* Sections III–IV.

and Senior Vice President Dan Dohar—were even aware that Mr. McErlain had previously filed the first PHRC complaint, although Ms. Still was aware that Mr. McErlain had generally complained about being suspended and about Mr. Little.[8] Nonetheless, nothing in the record suggests that Mr. McErlain's termination was retaliation for filing the first PHRC complaint. Ms. Still testified that the decision to terminate Mr. McErlain was based on a finding of insubordination, as supported by (1) statements made by four witnesses to the safety glasses incident, (2) the employee handbook and conduct guidelines, and (3) reports cataloguing prior instances of disobedience by Mr. McErlain.[9]

Without evidence of a pattern of potentially retaliatory conduct preceding Mr. McErlain's termination, and given the amount of time that lapsed between Mr. McErlain filing the first PHRC complaint and his termination, Mr. McErlain has not established the causation element of the *prima facie* case of retaliation. "Although the facts of this case present a tense employment situation . . . there is no evidence to suggest that these actions arose in response to [a protected activity], or even that the situation worsened after the submission of the [first PHRC complaint]." *Walsh v. Wal Mart Stores, Inc.*, 200 F. App'x 134, 137 (3d Cir. 2006). The retaliation claims therefore fail.

### III.    Mr. McErlain's *Prima Facie* Case of Age Discrimination

Unlike Mr. McErlain's retaliation claims, his age discrimination claims are based on conduct from both before *and* after his decision to file a complaint with the PHRC, and so Mr. McErlain can make a *prima facie* case of age discrimination. "[T]o establish a prima facie case of age discrimination, the plaintiff must demonstrate that (1) s/he is over forty, (2) is qualified for

---

[8]      *See supra* n. 3.

[9]      *See supra* n. 4.  To the extent that there is any evidence in the record that the decision to terminate Mr. McErlain was pretextual, that evidence only supports that termination was pretext for discrimination rather than termination.  *See infra* Sections III–IV.

the position in question, (3) suffered from an adverse employment decision, and (4) that his or her replacement was sufficiently younger to permit a reasonable inference of age discrimination." *Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 370 (3d Cir. 2004) (citing *Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 167 (3d Cir. 2001)). As to the fourth element, if the plaintiff was not replaced or was replaced by a person of the same age, he or she can still prove a *prima facie* case by "provid[ing] facts which if otherwise unexplained" demonstrate that an employer's decision was more likely than not "based on the consideration of impermissible factors." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015) (citation and quotation omitted). The same requirements apply to each of Mr. McErlain's PHRA and ADEA age discrimination claims. *Cridland,* 929 F. Supp. 2d at 384.

SPS only disputes the fourth element of Mr. McErlain's *prima facie* case of age discrimination, i.e., whether Mr. McErlain was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive. SPS focuses on the fact that Mr. McErlain was not replaced by a younger employee (because the position was filled internally) and so Mr. McErlain cannot possibly make the required showing. But the *prima facie* case "was never intended to be rigid, mechanized, or ritualistic.'" *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002). Because Mr. McErlain was not actually replaced, he must "provide facts" about his removal, which, "'if otherwise unexplained,'" show that his termination was "'based on the consideration of impermissible factors.'" *Willis*, 808 F.3d at 644 (quoting *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999)).

Mr. McErlain identifies four facts supporting his claims, showing that it is more likely than not that SPS impermissibly discriminated on the basis of Mr. McErlain's age.

First, Mr. McErlain's productivity came under increased scrutiny shortly before he turned 60. According to the record, SPS disciplined Mr. McErlain for his productivity only three times during the first 30 years Mr. McErlain worked at the company. *See supra* at 2. As Mr. McErlain approached age 60, however, he received numerous official reprimands for his outputs over a relatively short period, *see supra* at 3–4, as well as other productivity-related criticism from his supervisor James Little. SPS counters that all employees were subject to the same heightened productivity thresholds and that several employees of ages comparable to Mr. McErlain were able to meet the same productivity metrics that Mr. McErlain could not. See *supra* at 5. The evidence of similarly aged SPS employees' production is scant, however. The record includes only one undated report, *see* MSJ, Ex. H, making it unclear whether the productivity catalogued therein occurred over a short or extended duration. Additionally, SPS has not rebutted Mr. McErlain's showing that he was disciplined for falling below productivity requirements with any evidence of how SPS treated similarly situated employees, i.e., employees who also *missed* their productivity requirements. Without additional evidence, Mr. McErlain's contention that SPS used its productivity standards to target him is unrebutted.

Second, Mr. McErlain argues that his work's quality was baselessly criticized as he neared 60. Until then, Mr. McErlain's work record reflected that his products did not contain "defects" and his products were not "scrapped," meaning that the products he produced were of good quality. *See supra* n. 1. After turning 60, Mr. McErlain began receiving substantially lower quality scores on his reviews. As noted above, however, this criticism overlooks that SPS's reports score quality and quantity together, and so Mr. McErlain's quality scores could have been driven down by his low productivity scores. *Id.*

Third, Mr. McErlain argues that Mr. Little's practice of calling Mr. McErlain "Kenny," instead of addressing him more formally, was meant to "taunt and goad" the substantially older Mr. McErlain. By using the overly familiar, even childlike, name, Mr. McErlain asserts that Mr. Little deliberately called attention to their age difference, using the nickname as a pretext to agitate Mr. McErlain with the hope of subjecting Mr. McErlain to discipline for insubordination.

Fourth, Mr. McErlain alleges that only as he approached age 60, SPS—and specifically Mr. Little—took issue with the fact that Mr. McErlain waited to put on his safety glasses after he clocked-in to work, even though doing so had been an accepted practice at SPS for the entire time that Mr. McErlain had worked for the company. The record does not reflect how the safety glasses policy was enforced against other SPS employees, but does show that SPS had recently conducted a safety audit and had been enforcing the policy more stringently as a result.

Read alone, any one of these facts or trends might not be enough to demonstrate SPS's use of "impermissible factors" in making employment decisions. But as a whole, this pattern of behavior, and in particular the timing of the reprimands received by Mr. McErlain compounded by Mr. Little's use of the nickname "Kenny," to which Mr. McErlain took such exception, could be sufficient "to convince a reasonable factfinder" that age impermissibly affected the way SPS and its employees interacted with Mr. McErlain. *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). Mr. McErlain has made a *prima facie* showing that he was the victim of age discrimination.

## IV.    *McDonnell Douglas* **Burden Shifting for Mr. McErlain's Age Discrimination Claims**

Because Mr. McErlain has established a *prima facie* case of age discrimination, the Court proceeds to the next phase of the *McDonnell Douglas* burden-shifting analysis, which is two-phased. First, SPS must rebut Mr. McErlain's *prima facie* case by presenting evidence of a

legitimate, nondiscriminatory reason for disciplining the plaintiff. Second, Mr. McErlain can then overcome SPS's showing by establishing facts that would cause a factfinder to disbelieve SPS's legitimate purpose or believe that SPS was nonetheless more likely than not motivated by a discriminatory purpose. Although SPS has presented evidence of a nondiscriminatory reason for its discipline, Mr. McErlain has overcome SPS's showing, albeit by a close margin.

### A. SPS's Legitimate Nondiscriminatory Reason for Discipline

Mr. McErlain has made a *prima facie* case of age discrimination, transferring the burden to SPS to establish a legitimate, nondiscriminatory reason for the allegedly discriminatory conduct. Here, there is record evidence supporting that Mr. McErlain's productivity writeups and termination were nondiscriminatory.

First, it is undisputed, based on the reports included in the record, that Mr. McErlain was not satisfying his productivity targets. Second, the incident for which Mr. McErlain was fired, the "safety glasses incident," resulted from Mr. McErlain's failure to comply with a company policy (even if Mr. McErlain was in keeping with standard practice). And after Mr. McErlain failed to comply, multiple witnesses, including witnesses against whom there are no allegations of discrimination, similarly reported that Mr. McErlain lost his temper with two supervisors and disobeyed a direct order to put on his safety glasses. Mr. McErlain makes no allegation of pretext against Mr. Allem, one of the supervisors who enforced the safety glasses policy. SPS has carried its burden as to this *McDonnell Douglas* factor.

### B. Mr. McErlain's Evidence that the Discipline Was Pretextual

After a defendant rebuts the plaintiff's *prima facie* case, the plaintiff can survive summary judgment by presenting either direct or circumstantial evidence discrediting the defendant's showing or otherwise making it more likely than not that the discipline was

pretextual. The plaintiff can prove pretext by submitting evidence that either casts doubt on the employer's justification or that shows that discrimination was more likely than not a "but for" cause of the employment action. *See Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994) ("[A] plaintiff who has made out a *prima facie* case may defeat a motion for summary judgment by *either* (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.").

Here, the question of whether SPS pretextually disciplined Mr. McErlain overlaps substantially with the Court's analysis of Mr. McErlain's *prima facie* case, namely whether SPS considered impermissible factors in disciplining Mr. McErlain. To succeed, Mr. McErlain must present evidence that would "allow [the] factfinder to disbelieve the employer's reason for the adverse employment action." *Willis*, 808 F.3d at 644 (citing *Fuentes*, 32 F.3d at 765). As outlined above, Mr. McErlain argues that he was the victim of a persistent discriminatory conspiracy because:

➢ SPS only began setting heightened productivity requirements once Mr. McErlain neared turning 60;

➢ His supervisor, Mr. Little, improperly gave Mr. McErlain bad reviews for the quality of his work, despite the fact that Mr. McErlain never received any complaints or criticism for his work's quality—and indeed Mr. Little himself recognized that sometimes Mr. McErlain could be too focused on perfection;

➢ Mr. Little used the nickname "Kenny" to refer to Mr. McErlain, over Mr. McErlain's objections; and

➢ Although there may have been a policy that all SPS employees were required to always wear safety glasses, in practice it was common for employees, including Mr. McErlain, to wait until after clocking-in to put on their glasses.

Some of Mr. McErlain's evidence of discrimination does not hold water. As noted above, SPS was not necessarily unjustified in giving Mr. McErlain poor marks for the quality of

his work because, given that quality and productivity were graded together, Mr. McErlain's productivity alone may have been responsible for dragging down his quality scores. *See supra* n. 1. Further, SPS's stated reason for letting Mr. McErlain go was that he lost his temper and was insubordinate during the safety glasses incident, and it is undisputed that Mr. McErlain was violating the letter of the safety glasses policy prior to the incident.

But it also cannot be the case that employers may inoculate themselves from repercussion by arbitrarily enforcing existing policies to manufacture a rationale for firing an employee, especially where there is evidence that the employer may have predetermined to target that employee based on a protected trait. In other words, SPS could not use the safety glasses policy (or its productivity requirements) to goad Mr. McErlain into insubordination, where the only true reason for enforcing the company's policies against Mr. McErlain was SPS's desire to drive out an aging employee. Mr. McErlain has presented just enough evidence to allow a factfinder to determine that SPS desired to drive out Mr. McErlain because of his age. Mr. Little's use of "Kenny" to refer to his significantly older subordinate, Mr. McErlain, arguably had ageist undertones. And it is undeniable that SPS, and in particular Mr. Little, rigidly enforced SPS's productivity requirements and safety requirements against Mr. McErlain only once Mr. McErlain was nearing or past his 60th birthday. Taken together, a reasonable jury could determine that SPS's "actions could not have been for nondiscriminatory reasons." *Willis*, 808 F.3d at 645. As a result, Mr. McErlain has carried his burden to rebut SPS's nondiscriminatory rationale for its interactions with Mr. McErlain. The age discrimination claims will therefore survive summary judgment.

## V.     Mr. McErlain's Mitigation Efforts

Finally, SPS argues that Mr. McErlain cannot collect front pay and back pay because he did not mitigate his damages.  SPS cites one Louisiana district court case stating that a plaintiff who brings claims for front pay and back pay under the ADA (rather than ADEA) has a duty to mitigate his damages "by using reasonable diligence to obtain substantially equivalent employment."  *Smith v. JP Morgan Chase*, No. CIV.A. 09-0168, 2011 WL 841439, at *11 (W.D. La. Mar. 8, 2011).  This Court has similarly held that "a plaintiff has a duty to mitigate both back pay and front pay damages by 'demonstrating a continuing commitment to be a member of the work force and by remaining ready, willing, and available to accept employment.'"  *Briggs v. Temple Univ.*, 339 F. Supp. 3d 466, 507 (E.D. Pa. 2018) (quoting *Booker v. Taylor Milk Co.*, 64 F.3d 860, 864–65 (3d Cir. 1995)).  But to establish that Mr. McErlain failed to mitigate, SPS has the burden to demonstrate that "(1) substantially equivalent work was available, and (2) [Mr. McErlain] did not exercise reasonable diligence to obtain the employment."  *Booker*, 64 F.3d at 864.  Although it is undisputed that Mr. McErlain stopped applying for jobs in October 2016, Pltff. Counterstatement of Facts ¶ 144a, neither Mr. McErlain nor SPS submitted any evidence about the availability of equivalent work.  The Court therefore denies summary judgment on this issue.

### CONCLUSION

Because it is not clear from the record whether SPS fired Mr. McErlain for its stated reason or based on discriminatory pretext, the Court will deny SPS's motion as to the age discrimination claims.  But the record allows only one conclusion as to Mr. McErlain's retaliation claims, which must be dismissed.  As a result, and based on the foregoing analysis,

SPS's motion for summary judgment is granted in part and denied in part. An appropriate order follows.

BY THE COURT:

/s/ Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE